Please the court. My name is John Allison. I represent Deborah Douglas in her appeal of the district court's dismissal of her employment discrimination claims against Eaton Corporation. Mrs. Douglas. Rebuttal time. Oh I'm sorry your honor, yes. May I have three minutes of rebuttal time please? Alright, go ahead. Thank you judge. Mrs. Douglas has three distinct discrimination claims. Discrimination on the basis of national origin and gender under Title VII and state law and discrimination on the basis of age under the ADEA and state law. The district court committed three reversible errors in dismissing her claims. It committed a reversible error when it held that she could not establish replacement, that she could not establish an adverse action with respect to her termination and that she did not present direct evidence of national origin discrimination. With respect to circumstantial evidence and proving a case that way, Mrs. Douglas presented evidence that she met the three protected classes. She was American born, female and over 40. She presented evidence that she was qualified for her position. She presented evidence that she suffered two adverse actions. One, that she was terminated from her position in China and two, that she was terminated from Eaton Corporation. The fourth element that you have to show in a prima facie case of employment discrimination is either replacement. She shows that when she was terminated from her position in China, she was replaced by Kok Meng Tang, who was Singapore, born in Singapore, significantly younger and male. With respect to being terminated from Eaton Corporation, she shows that she was passed over with respect to positions she applied for by persons outside of the protected class. I'll cover a couple of those, Mike Roberts and Dave Bennett, who are male and significantly younger. The district court held that Ms. Douglas could not demonstrate an adverse action or replacement with respect to losing her position in China because the letter that extended her expatriate assignment gave an end date for the assignment. The letter actually did not say that her employment would end on that date. In addition, the court ignored all of the evidence that demonstrated that the dates on these letters extending and or setting forth the terms of an expat assignment do not, in fact, typically control the end date of the assignment. There was testimony in the record by multiple individuals that, in fact, the typical process is when a person is going to repatriate from an expat assignment, they find a position first, then their position is backfilled. When you're looking for a position to repatriate to, you can often turn down positions. Sometimes your expat position ends early, sometimes it ends later, sometimes it's extended. With respect to Ms. Douglas' position, what's important to note is that the two decision makers, Mr. Sternweiss and Ms. Advathy, testified that there was a preference to hire local people to fill positions once those folks are ready to fill them. They also testified that Ms. Douglas asked, or at least one of them testified that Ms. Douglas asked to be repatriated within the next several months and they used... So could we help? Let's focus for a minute. If the court were to assume that you meet and you've shown adverse action with respect to each of her claims, it seems to me the issue goes to her ability to demonstrate that the reasons that the employer presented were pretextual, that they actually are covers for intentional discrimination. Yes, Your Honor. So why don't you address those in view of the various options that were afforded your client. Yes, Your Honor. So the legitimate non-discriminatory reason presented by the appellee in this case for Ms. Douglas departing from her position in China is that her assignment ended. That can't really... Is that disputed? Well... It was contractual? It is... It could be. It's not disputed that it ended. It's disputed the reason why it ended. So is the fact that it ended evidence of pretext? We think the timing of the ending of her assignment is evidence of pretext given the circumstances around that timing. One, that there was testimony that there's a preference to hire local individuals. They identified a person, Kok Ming Tang, who was ready to take that spot. Two, that they testified the decision makers that Ms. Douglas actually requested to leave. What sort of discrimination does this show? I mean, it might show they wanted to get rid of her maybe, but what sort of... I mean, that's not illegal. It's got to be on some prohibited basis. Right. We believe it's national origin discrimination with respect to... Discrimination against Americans. Yes. Okay. There was a preference to hire locals... In a foreign country. In a foreign country, but that expressed preference. I think a significant point here is Ms. Douglas was employed in this foreign country for four years. She was comfortable with the culture. She was comfortable with her surroundings. If that's not hiring a local, then what is meant by we want somebody local? Somebody who was born there. Somebody who's lived there longer. We think that that's at least circumstantial evidence. We argued at the district court level that it was direct evidence of national origin discrimination, but we think it's at least circumstantial evidence that this preference to hire local folks when they're ready to take spots and push out American-born citizens is evidence of... Out of their expat positions. Yes, Your Honor. What do you say about the age and the pretext with respect to the other claims? Certainly we think that... Again, at the pretext level, Mr. Tang certainly was significantly younger and male. In terms of demonstrating pretext with Ms. Douglas losing her position with Eaton, there are a number of positions that she applied for and did not receive. There's actually a chart that we received and it is... I guess most significant to me, to have an explanation from you about, is the position she was offered in Pittsburgh that she rejected in favor of a higher pay grade. Yes, Your Honor. There was a position that she was not... Yes, we know this. We know exactly what's your answer to why that she's nevertheless able to demonstrate that the real reason the company didn't retain her was that she was too old. With respect to that position, she did decide not to move forward and that is true, Your Honor. However, there is evidence in the record that when people are expats and they're repatriating, they also have turned down positions when they thought there were multiple positions available. With respect to the other positions she sought, there was one position, for example, a plant manager position in Raleigh, North Carolina. She interviewed for that and was told, we are looking for somebody with long-term potential who can replace me, the person who is currently in the job. The person who was then hired for that job was Mike Roberts, who's 13 years younger and male. We believe that's circumstantial evidence that her age was the reason she did not receive that position. If you look at the chart and in the record, it's page ID 5153, and it says 2521. Seven of the eight individuals hired for positions Miss Douglas sought are male. Five out of eight are significantly younger. Again, with respect to the position that Mike Roberts got, the plant manager position, she was specifically told that the quality she was lacking is we're looking for somebody with long-term potential. The company recruited her and chose to find a spot for her just one grade lower, and just knowing her age and knowing her gender, she still maintains that this company is hell-bent on keeping her from being re-employed. Well Mr. Sternweiss did not make the decision to not give her that position. It is true that Mr. Sternweiss did make her aware of some positions that were available, and early on in the process, which is fairly typical for an expat, and she's looking at potential options, some of them she wasn't as interested in because they looked like promotions to her, they were lower salary band, and that is true. That became less true later on in the process when she realized I don't have as many options as I thought, and then that is when she was told with respect to this plant manager position, you're not going to get it because you can't make a long-term commitment, even though she said I can make a long-term commitment. And I do want to get back to your honor, there is evidence in the record again as to the able to look for and find a job before their position is backfilled, and that is on page ID 1861 to 1862, the testimony of Mark Thompson. There's similar testimony from Kevin McLean, page ID 680, and there is testimony relative to I would say the fact that these expat positions can be shorter, longer, what have you, than what's on the letter that sets forth the terms. And even the letter itself says the estimated length of assignment, it doesn't say length, it says estimated length of assignment, because there is this understanding that people do leave early, people do leave late, people do extend the assignment, it's all dependent on if they find a position that makes sense to move to, and if they can backfill the position. And in this case, she was really pushed out early because of the preference to hire a local based on his national origin. I think my time is up for the first session, your honor. Thank you. Mr. Heary, we'll hear from you. Thank you. May it please the court, my name is Bruce Heary on behalf of the appellee Eaton. I think it is important to focus on Eaton's expatriate assignment policy, which clearly puts the onus on the employee, find a position, the policy forewarns anybody on an expatriate assignment that it's their job to continue to monitor what opportunities may be available to them upon their return. Ms. Douglas in this case has tried to put the onus on Eaton to find her a job, not only to find her a job upon her repatriation, but to find her a job that actually met her criteria of satisfaction. The record is devoid of any objections by Ms. Douglas to her expatriate assignment ending when it did. She was no stranger to expatriate assignments. She had successfully completed an expatriate assignment when she was over the age of 40, when she went to Canada in her 40s and was there for four years and successfully repatriated to Pittsburgh. When she went to China in 2006, it's hard for me to understand counsel's argument about to Ms. Douglas in 2006 for an initial term of three years. That term was mutually extended for another year with the understanding that there is an end date for these expatriate assignments and there was going to be in this case. It was only after Ms. Douglas indicated in the fall of 2009 that she was willing to return to the United States in 2010 that Kak Meng was identified as someone who would fulfill that function once she was gone. There's also in the record emails from Ms. Douglas reassuring the company that she has taught Mr. Meng everything she knows and that she's ready to return as she did. With respect to the pretext argument, I don't think there's any evidence of age discrimination in this case. Ms. Douglas was fairly treated for a long period of time, given many promotions. She was a salary band 14, and I think it's important to note the salary bands. There's not a whole lot of difference between a salary band 14 and a salary band 13, for example. Roughly, a salary band 14, for example, runs from $140,000 base salary up to about $240,000. A salary band 30 runs from $130,000 up to about $230,000. So there's about a 90% overlap between those positions. And it's not unusual to have someone who is at a higher level of a salary band 13 making more money than someone who's in the lower echelons of a salary band 14. So the job opportunity that Mr. Sternweiss made available to Ms. Douglas was a directly comparable job, a job that was as complex as the job she had in China. The same amount of sales, if not more. Multiple countries, a very sophisticated job. She was grandfathered in at the same salary for two years, and she rejected that, as she had the right to do. She indicated in her deposition that she was only interested in repatriating to a job that she described as different, exciting, and challenging. Now ultimately, at some point in her job-looking process, she actually retained a headhunter and sent an email to her supervisor saying, I think I might do better on the outside, so I'm not too worried about getting a job within Eaton. Ultimately, she decided to pursue a somewhat lifelong passion of hers to open a dog kennel, which she and her husband did a couple of months after they departed from Eaton. For all these reasons, we think that the record is clear, that there's no evidence of pretext, that the company did have a legitimate reason for ultimately transitioning Ms. Douglas no longer with the company because of her inability to find a position. For all those reasons, we think the court was correct in finding that there was no reasonable basis, that no reasonable-minded juror could find evidence of discrimination under these circumstances. So if the panel has any questions, I'm happy to answer them. Thank you. I didn't want to address a few points by Mr. Heery. With respect to the preferring of locals and the fact that Eaton did hire Ms. Douglas for a position in China, that's true. But the preferring of locals is only when they have identified a local who's ready to take a position. That's when that comes into play. And again, our position is the way this happened, the way Ms. Douglas was, we believe, forced out prior to being ready because she hadn't yet located a job to return to in the U.S., is evidence of national origin discrimination. And again, Mr. Heery alluded to the allegation that Ms. Douglas said she was ready to return. I think a fair reading of her testimony is that after having been there for four years, she's certainly interested in a new opportunity, but that she never said she wanted to leave China. And this is what her testimony is. She never said she wanted to leave China until there was an opportunity that she could go to that made sense. And that was her understanding of how this typically worked in terms of repatriating. And that was based on what she'd done in the past, what she'd seen with other people repatriating from expat assignments. And there's other testimony in the record that that is typically what the process is. I think there seemed that there was testimony that other younger male expats were unable to find assignments upon repatriating. That there were others who were not able to find assignments? Yes. Yes, Your Honor. I will say that at any given time, Eden has 100 or more people on expat assignments, and they have put in front of the court a couple of male individuals who were not able to repatriate to a new job when they left their expat assignment. Can we say that that's never going to happen? No. But I think that the evidence here suggests that the reason Ms. Douglas was repatriated, or at least we've raised an issue of fact, which is enough to show pretext, that under the circumstances here, she was forced out early because of the preference to hire a local candidate who they had identified as ready to take her spot. And that when she got back, we've produced evidence that she was specifically told that she was not going to get the Raleigh plant manager job because she couldn't make a long-term commitment. And instead, a significantly younger male got that position. And so we think we've demonstrated evidence that the reasons put forth by Eden that her job assignment ended, and it's as simple as that based on that letter, and that she couldn't find a position without, we think we've shown that that's pretextual because of the fact that she was told that she couldn't find a spot, that she couldn't get the spot because she couldn't make a long-term commitment. And again, the sequence of events with leaving the job in China, we think demonstrates that it's not the letter that controls whether or not the position ends, but in this case, she was forced out after they identified a local who could take the job. Okay. Your time is up. Thank you, Your Honor. I appreciate the argument both of you have given, and we'll consider the case carefully. Thank you, Your Honor.